

# SUPREME COURT OF MISSOURI
# en banc

In the Interest of: Q.A.H.,                      )
                                                 )
                                                 )
JUVENILE OFFICER,                                )
                                                 )
                            Respondent,           )
and C.W.M. and C.D.M.,                           )
                                                 )
                            Respondents,          )
                                                 )    No. SC93677
v.                                               )
                                                 )
M.H. (MOTHER),                                   )
                                                 )
                            Appellant.            )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Justine Del Muro, Judge

### *Opinion issued March 25, 2014*

The issue in this case is whether there was substantial evidence to support the trial court's decision to terminate M.H.'s ("Mother") parental rights over Q.A.H. ("Child"). The trial court determined that Mother had abused or neglected Child in that she had a mental condition that rendered her unable to provide Child the necessary care, custody and control and that she failed to provide adequate food, clothing, shelter or education to

Child although she had the financial resources to do so. *See* section 211.447.5(2).[1] It further found that she failed to rectify the conditions that led the court to assume jurisdiction. *See* section 211.447.5(3).

Mother argues that the trial court's determination was not supported by substantial evidence because it failed to consider evidence from her psychiatrist and therapist regarding her mental condition at the time of the termination hearing, did not connect her mental condition to the potential for future harm, and disregarded evidence that she was parenting another child and had attempted to make support payments. This Court granted transfer pursuant to Mo. Const. art. V, sec. 10. Because a trial court is free to disregard testimony in making credibility determinations and weighing evidence, it was not error for the trial court to discredit the testimony from Mother's psychiatrist and therapist or find Mother's custody of another child did not show Mother could provide the necessary care, control or custody to Child. Additionally, the trial court did not err in finding that Mother's de minimus financial contributions did not show that she provided adequate support to Child before the termination hearing. The judgment is affirmed.

## I. Factual Background

In August 2009, Mother suffered from a delusional episode and brought five-month-old Child to a hospital. Hospital records reflect that Mother stated that both she and Child had been sexually molested in their sleep by unknown perpetrators and that this was possible because sedatives were being pumped into their home through the heating

---

[1] All references are to RSMo Supp. 2012.

vents.  She further stated that someone placed a listening device inside Child's vagina and requested that Child be circumcised and that her vagina be sewn closed.  At the termination hearing, Mother denied making many of these statements but stated that she still believed it was possible that she and Child were drugged through the heating vents in their home.

After the hospital visit, Child was placed in foster care and Mother began psychiatric support and weekly supervised visits with Child.  These weekly visits continued until March 2010, when Mother regained custody of Child for four months.  Mother again lost custody of Child in July 2010, when she refused to allow Child's father to have court-ordered supervised visits with Child due to her continued belief that he had raped Mother.[2]  The trial court found that there was no evidence to support this allegation but that Mother's delusion was consistent with her mental health diagnosis.  It further found that this continuing belief would likely be communicated to Child at some point and that this was "a serious risk of emotional harm to the child."  Child was approximately one year old when this happened.  Child is now five years old and has resided with the same foster parents since Mother lost custody in 2010.[3]

After Mother lost custody of Child the second time, she gave birth to a son in Kansas.  Mother was in a relationship with the father of this child for five months, despite

---

[2] Mother and Father were never married, and Father had supervised custody visits.  He voluntarily terminated his parental rights prior to the instant proceedings.

[3] Child's foster parents initiated this action to terminate Mother's parental rights and adopt Child. The parties agreed to proceed in a bifurcated fashion so the trial court would not address any adoption issues until the termination issue was fully resolved.

knowing he had a violent history. On one occasion, she called the police while visiting with her son and his father because she feared for her safety. Mother acknowledged to her therapist that she had feared for her safety on at least two prior occasions. Records from the mental health facility where Mother received psychiatric and therapy support indicated that, as of three months prior to the hearing, Mother was still interested in pursuing a relationship with her son's father. Mother also testified that she had previously been in a relationship with Child's father, despite her belief that he was sexually violent towards her because she needed a place to live and did not want to stay in a shelter.

Although a Kansas court assumed jurisdiction over her son when he was born, it subsequently granted Mother full custody. The Missouri trial court noted that Kansas service providers who testified at the termination hearing did not communicate with or receive information from service providers in Missouri. It concluded that the Kansas court may not have been aware of the circumstances in the instant case.

In early 2012, Mother moved from Kansas to Missouri. She testified that she reconnected through the Internet with a man whom she had known since her childhood. He began supporting her financially by giving her as much as $1,000 per month. After several months, Mother moved in with the man against her psychiatrist's advice. From this time through the termination hearing in September 2012, Mother was unemployed but did obtain her associate's degree online. She lived on welfare benefits and the support of the man with whom she lived.

The trial court found that Mother only provided de minimus financial support to Child for the time that Child was not in Mother's custody. Mother stated she could have provided up to $100 per month in child support, and she could have used some of the money she received from the man with whom she lived for child support as well. However, she did not provide any financial support while Child was not in her custody aside from a few small gifts of clothes and small toys. Although she testified that a children's division caseworker told her she did not need to provide support for the child, the caseworker disputed this testimony and the trial court found that Mother's testimony was not credible.

Mother had been under psychiatric care for approximately three years before the termination hearing. Shortly after the 2009 hospital incident, a licensed psychologist conducted a court-ordered evaluation and diagnosed Mother with psychotic disorder and possible post-partum psychosis. He noted that she presented a narrative that seemed delusional but that she was intelligent enough to adjust her statements. While various different diagnoses have been posited since then, the trial court determined that Mother has delusions that become her reality and that this presents a clear danger to Child.

Mother's psychiatrist stated that Mother's present diagnosis is posttraumatic stress disorder, but with a possible generalized anxiety disorder, mild depression and mild delusional disorder. He saw Mother 10-12 times in the three-year period between the episode at the hospital and the termination proceeding, for usually 15-20 minutes each time. He did not read assessments from other therapists working with Mother but rather

5

relied on self-reports from Mother. While he testified that Mother was capable of caring for Child, the trial court did not find him "particularly credible."

Similarly, Mother's therapist began meeting with Mother in June 2011 and continued to see her through the termination hearing. She testified that Mother had a positive long-term prognosis and was capable of caring for Child. The trial court did not find the therapist credible because she did not consider information from parent aides who had been meeting with and supervising Mother. Instead, she relied on self-reports from Mother, which "undercut" the therapist's testimony.

In contrast to Mother's professionals, a parent aide report from two months prior to the hearing indicated that it "is often not clear if what [Mother] is saying is always the truth." Parent aide reports indicated that Mother continued to have "adult" conversations with Child and continued to have inappropriate developmental expectations for Child, such as giving too-detailed instructions to manage Child's behavior, causing Child to become confused and cry. Two months prior to the hearing, Mother was still working on her treatment goals of obtaining employment and a stable living environment and engaging with Child in a developmentally appropriate manner. Her treatment plans from four months prior to the hearing indicate that she continued to experience unstable moods and reactivity to life stressors. They also indicate that she was still working toward establishing and maintaining safe personal boundaries, given her history of engaging in unhealthy relationships. Further, Mother's caseworker from the children's division testified he did not believe that Mother and Child could be reunited in the foreseeable future. Child's guardian ad litem also supported terminating Mother's rights.

6

Based on the above evidence, the trial court determined there were three statutory grounds to terminate Mother's parental rights under section 211.447. It found that Mother abused or neglected Child in that her mental condition was such that it rendered her unable to knowingly provide Child with the necessary care, custody and control under section 211.447.5(2)(a). Additionally, it found that Mother abused or neglected Child by failing to provide adequate food, clothing, shelter or education despite having the financial resources to do so, pursuant to section 211.447.5(2)(d). The trial court further found, under section 211.447.5(3), that Child had been under jurisdiction of the court for over one year and that the conditions which led to the assumption of jurisdiction persisted, or conditions of a potentially harmful nature continued to exist, such that there was little likelihood that those conditions would be remedied at an early date so that Child could be returned to Mother in the near future, or that a continued relationship between Mother and Child greatly diminished Child's prospects for early integration into a stable home. Mother appeals.

## II. Standard of Review

A reviewing court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence or erroneously declares or applies the law. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011). The trial court's judgment will only be reversed if this Court is left with a firm conviction that the judgment is wrong. *Id.*

An appellate court reviews conflicting evidence in the light most favorable to the trial court's judgment. *Id.* The reviewing court defers to the factual findings and

7

credibility determinations made by the trial court. *Id.* If the evidence presents two reasonable but different inferences, the reviewing court considers the inference in the light most favorable to the judgment. *Id.* To terminate parental rights, the trial court must find clear, cogent and convincing evidence of at least one of the grounds of termination outlined in section 211.447. Section 211.447.6; *In re Adoption of C.M.B.R.*, 332 S.W.3d at 815-16.

### III. Analysis

The only issue before this Court is whether there was substantial evidence to support the trial court's judgment that there was at least one statutory ground to terminate parental rights. Here, the trial court found three statutory grounds to support the termination of Mother's parental rights. To terminate parental rights, courts also must determine whether termination is in the best interests of the child. *In re Adoption of C.M.B.R.*, 332 S.W.3d at 815-16. Mother does not challenge the trial court's determination that terminating her rights is in Child's best interests.

Mother contends that the trial court's determination was not based on substantial evidence because: (1) it failed to consider evidence of her functioning at the time of the termination hearing; (2) it failed to find a connection between her mental condition and the potential for future harm to Child; and (3) it disregarded evidence that she was parenting another child and had attempted to make some child support payments.

### A. Evidence of Mother's Current Inability to Provide the Necessary Care, Custody and Control of Child

8

Using the same language as section 211.447.5(2)-(3), the trial court determined that Mother abused or neglected Child as a result of her mental condition, which was not likely to be reversed and rendered Mother unable to knowingly provide Child the necessary care, custody and control. Further, the trial court found that she failed to rectify the conditions that led the court to assume jurisdiction.

When a parent's rights are terminated as a result of a mental condition, the decision must be based on evidence of conduct at the time of the termination, not merely when jurisdiction was taken. *In re K.A.W.*, 133 S.W.3d 1, 10 (Mo. banc 2004). Factors that supported the assumption of jurisdiction are relevant, but they must be updated to reflect functioning at the time of the termination hearing. *Id.*

Mother contends that the trial court did not consider her current mental health because it disregarded testimony from her psychiatrist and her therapist that Mother was capable of parenting Child. The trial court found that they were not credible witnesses because neither consulted with other service providers and relied primarily on self-reports from Mother. Mother argues that it was improper for the trial court to reject their "expert medical opinions" and replace it with the court's own medical opinion, citing *Angus v. Second Injury Fund*, 328 S.W.3d 294 (Mo. App. 2010).

*Angus* is not instructive in this case. *Angus* was a workers' compensation case involving a dispute over which type of arthritis caused the claimant's injury. The court of appeals found that the Labor and Industrial Relations Commission erred in rejecting the only and uncontroverted expert testimony regarding the medical causation of the injury

9

because the issue of dueling types of arthritis was a "complex *medical* issue not within the expertise of an administrative law judge." *Id.* at 302.

Unlike *Angus*, the issue here – whether Mother was able to care for Child – is not a "complex medical issue." Further, there was substantial evidence regarding Mother's inability to provide the necessary care, custody and control for Child at the time of the termination hearing from both Mother and trained social services providers. At the termination hearing, Mother testified that she still believed it was possible that she and Child were administered sedatives through the heating vents in their previous home, enabling them to be sexually assaulted without her knowledge. She continued to maintain the belief that Child's father raped her, although the father denied this, and the trial court found the father's testimony credible.

Additionally, parent aide reports completed shortly before the termination hearing stated that it is "often not clear if what [Mother] is saying is always the full truth," which is consistent with the psychologist's observations in 2009 that Mother suffered from delusions but could adjust her statements. A parent aide report from just two months prior to the hearing indicated that Mother continued to have inappropriate expectations regarding Child's behavior and cognitive functioning. Further, at the termination hearing, children's division representatives and Child's guardian ad litem both supported terminating Mother's parental rights. A representative from the children's division testified that, despite the services offered to and used by Mother, Mother continued to struggle emotionally during the proceedings and that Mother could not be unified with Child in the near future.

10

In examining this evidence, the trial court found that Mother's professionals were not credible in their assessment of Mother's parenting abilities. As fact finders, trial courts are free to believe all, part or none of a witness's testimony. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984). Because the trial court considered other evidence of Mother's mental condition at the time of the termination hearing, it was free to disbelieve Mother's professionals. In doing so, there was still substantial evidence that Mother continued to suffer from the delusions she experienced in 2009.

Mother next argues that the trial court's judgment should be reversed because it failed to consider the fact that she was awarded custody of her son from a Kansas court. A Kansas Court Appointed Special Advocate (CASA) volunteer testified that there were no concerns regarding Mother's ability to raise her son. Mother suggests that this shows her mental condition does not prevent her from being able to raise a child. The trial court, however, addressed the Kansas proceedings but found that the Kansas service providers had not communicated with, or received information from, the service providers in Missouri. As noted before, the trial court is free to disregard and weigh evidence as it sees fit. *See In re Adoption of W.B.L.*, 681 S.W.2d at 455. As such, the trial court was free to find this evidence unpersuasive. Additionally, evidence in the record that would support a different conclusion does not necessarily mean the judgment was not supported by substantial evidence.[4] *See id.* at 454.

---

[4] Mother's argument is also misplaced, as one successful parent/child relationship does not necessarily mean that the circumstances that led the court to assume jurisdiction have been

## B. Evidence of Potential Future Harm

When a court relies on a parent's past behavior to find abuse or neglect, it must make "some explicit consideration" of whether the past acts indicate a likelihood of future harm. *In re K.A.W.*, 133 S.W.3d at 9-10. In this manner, the parent's past conduct may be good evidence of future behavior, but it must be "convincingly linked" to future behavior.[5] *Id.*

It is true, as Mother points out, that Child was not physically harmed when Mother brought her to the hospital. Threats, however, are a sufficient basis for finding harm to the child. *See, e.g.*, *In re T.L.B.*, 376 S.W.3d 1, 12-13 (Mo. App. 2011) (court terminated parental rights when Mother threatened to harm her children). Additionally, the standard is a prospective analysis and considers whether there is a *likelihood* of future harm. *See In re K.A.W.*, 133 S.W.3d at 10. In this manner, the trial court specifically noted that Mother continued to suffer from delusions that become her reality and that this presents a danger to Child. For example, Mother continues to believe Child's father raped Mother. The trial court noted that this belief would likely be communicated to Child at some point because the parent aides reported that Mother continues to have "adult" conversations with Child about topics that are inappropriate for Child's age. The trial court concluded

---

remedied with respect to *other* children. *See In re E.D.M.*, 126 S.W.3d 488, 495-96 (Mo. App. 2004).

[5] After the court assumed jurisdiction in this case, section 211.447.10 was enacted. While it is not applicable to this case, that section cautions that a parent's disability shall not provide a basis for terminating parental rights "without a specific showing that there is a causal relation between the disability or disease and harm to the child."

that it would be a burden for a child to bear such false information about a biological parent.

Further, after three years of psychiatric support and therapy, Mother continues to work on her goal of setting healthy boundaries for her personal relationships. *See id.* (a parent's effort to comply with a treatment plan is highly relevant to predicting future behavior). This was necessary as Mother stayed in a relationship with Child's father despite her perception that it was a sexually violent relationship. She also stayed in a relationship with her son's father for five months despite feeling he jeopardized her safety on at least three occasions. Most recently, she moved in with a man against the advice of her psychiatrist, although both parties deny there is any romantic involvement. Drawing all reasonable inferences in the light most favorable to the trial court's judgment, there was substantial evidence to support the trial court's finding that Mother's personal relationships presented a potential harm for Child despite Mother's therapy.

### C. Evidence of Mother's Failure to Provide Adequate Support Despite Being Able to Do So

Finally, Mother argues the trial court erred in finding that she failed to provide financial support to Child despite having the financial resources to do so. She argues that the trial court's decision is not supported by substantial evidence because Mother testified that she was told not to make child support payments and the one check she did write was later returned. However, the evidence shows that Mother was told that she did not have to pay child support *during* the four months when she had custody of Child in 2010. There was no other evidence, other than her own statements, that she was told *never* to

13

pay support. Even had the trial court found Mother credible on this point, a parent's obligation to pay support does not stem from the state informing her of this obligation. *See, e.g.*, *In re N.L.B.*, 145 S.W.3d 902, 908 (Mo. App. 2004).

Despite being able to afford up to $100 per month in child support payments, Mother never paid any support during the nearly two years Child has resided with the foster parents before the termination hearing. The few clothes she provided were too small, and she only purchased a few toys for Child. Other items she purchased were clearly inappropriate for Child's age, such as a watch. The trial court found these contributions to be de minimus. There was substantial evidence to support the trial court's determination that Mother failed to support Child.

Further, to support a termination of parental rights based on a failure to adequately support a child, the parent's lack of financial support while the child is in foster care must indicate that the parent will be unable to provide adequate food, clothing, or shelter for the child in the future. *See, e.g.*, *In re C.A.L.*, 228 S.W.3d 66, 71 (Mo. App. 2007). While it is true that Mother has obtained an associate's degree, she had a sporadic work history before then and has remained unemployed since then. Though she claimed she could secure employment, at the time of the termination hearing, Mother was living on a combination of government aid and the generosity of the man with whom she lived. Without a residence or income of her own, it is unlikely that she will be able to provide adequate food, clothing and shelter for Child in the future.

## IV.  Conclusion

Under this Court's standard of review, there was substantial evidence to support the trial court's decision to terminate Mother's parental rights.  While the trial court considered the conditions that led it to assume jurisdiction over Child, it considered evidence of her current functioning and explicitly found that there was a potential for future harm.  Although the court disregarded the testimony from Mother's psychiatrist and therapist, it was free to do so because there was other evidence of Mother's inability to provide the necessary care, custody and control.  It was similarly free to disregard evidence that she was raising another child and to find that she did not provide financial support to Child despite giving Child a few small gifts.  In Child's five years, Mother has had custody of her for fewer than eight months, and Child has resided with her foster parents for over three and a half years.  Because there was substantial evidence of statutory grounds for termination and Mother did not contest the trial court's finding that termination was in Child's best interests, the trial court's judgment is affirmed.

_____

Mary R. Russell, Chief Justice

Breckenridge, Fischer, Stith, Draper
and Wilson, JJ., concur; Teitelman, J.,
dissents in separate opinion filed.

15



# SUPREME COURT OF MISSOURI
## en banc

In the Interest of: Q.A.H., )
)
JUVENILE OFFICER )
and C.W.M. and C.D.M., )
)
          Respondents, )
)
vs. )     No. SC93677
)
M.H. (MOTHER), )
)
          Appellant. )

### Dissenting Opinion

The principal opinion affirms the termination of Mother's parental rights based in large part on medical testimony that pre-dated the judgment by nearly three years. While the evidence in this case provides a snapshot of a troubled past, it fails to demonstrate clearly that Mother is currently unable to adequately care for the child and that she will be unlikely to do so in the future. Therefore, I respectfully dissent.

Missouri law is clear that the termination of parental rights must be based on parental deficiencies at the time of termination. While evidence of past issues is relevant, the parent-child relationship can be severed only on proof that the parent is currently unable to adequately care for the child and will be unlikely to so in the future. *See In re K.A.W.*, 133 S.W.3d 1, 10 (Mo. banc 2004); *In the Interest of C.W.*, 211 S.W.3d 93, 100

(Mo. banc 2007)(the evidence must establish the parent's "current mental health status and how that status impacts her present and future ability to adequately parent" the child).

In this case, the evidence establishes that in 2009, Mother suffered mental health issues. Mother concedes this fact. The dispositive issue, however, is Mother's parental unfitness at the time of the termination hearing in 2012. Mother's psychologist and therapist both testified that, as of 2012, Mother was capable of parenting. The trial court, however, chose to discredit this expert testimony in favor of its own diagnosis. The trial court tied the 2009 evidence to Mother's present parenting abilities by stating that:

> "[D]uring approximately 75% of the trial the mother smiled, grinned or made exaggerated expressions, which affect is quite unusual in a termination of parental rights proceeding, but is consistent with the mental health diagnosis given by Dr. McDonnell [in 2009]."

By expressly tying her observations of Mother's behavior to Dr. McDonnell's diagnosis from three years prior, the trial court's decision is simply speculative lay medical opinion and, as such, is well beyond the court's fact-finding purview. This opinion, masquerading as "fact," cannot support the termination of the legal relationship between Mother and her child. I would reverse the judgment terminating Mother's parental rights and remand the cause to the circuit court.

_____
Richard B. Teitelman, Judge