

# In the
# Missouri Court of Appeals
## Western District

IN THE INTEREST OF: D.T.H., M.J.H.;

                **Respondents,**

**JUVENILE OFFICER,**

                **Respondent,**

**v.**

**R.B.,**

                **Appellant.**

**WD84988**

**OPINION FILED:**

**September 13, 2022**

Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Jalilah Otto, Judge

Before Division Two:
Thomas N. Chapman, P.J., Mark D. Pfeiffer and Edward R. Ardini, Jr., JJ.

R.B. ("Mother") appeals a judgment of the Circuit Court of Jackson County which terminated her parental rights to D.H. and M.H. The circuit court determined that termination was appropriate based on three independent statutory grounds under section 211.447.5,[1] and that termination was in the best interest of D.H. and M.H. The judgment is affirmed.

---

[1] Unless otherwise indicated, statutory references are to RSMo 2016, as updated through the 2018 cumulative supplement.

## Background[2]

Mother is the biological mother of two daughters: D.H. (D.O.B. 10/16/2018) and M.H. (D.O.B. 9/12/2019).[3]

D.H. came under the jurisdiction of the circuit court pursuant to a petition filed on October 19, 2018 in case number 1816-JU001369, which alleged, *inter alia*, that D.H. was without proper care, custody and support necessary to her well-being. On the same day the petition was filed, the circuit court entered an order of temporary protective custody, which placed D.H. in the custody of the Children's Division. The court held a protective custody hearing on October 23, 2018, after which the court determined that D.H. was to remain in protective custody due to Mother's mental health and actions at the hospital such that D.H. could not safely be returned to Mother. Mother was to be allowed visitation on the condition that visits were supervised by Children's Division or a parent aide.

The circuit court conducted an adjudication hearing on March 18, 2019 on the Juvenile Officer's Second Amended Petition. With respect to Count 1 of the petition, the circuit court amended the allegations to conform to the evidence as follows:

> The child, [D.H.] (DOB 10/16/2018), is without proper care custody and support necessary for her well-being and is subject to the jurisdiction of this Court pursuant to 211.031.1 RSMo in that the mother neglects the child. The mother has been diagnosed with paranoid schizophrenia and suffers aural hallucinations, including during her pregnancy, that were threatening her and her unborn child. The mother told hospital staff that she did not believe her home was safe due to threats made against her but she nonetheless intended to return there with the child after the child's birth. The mother's boyfriend with whom she has had an ongoing relationship and who has resided in the home, has severely physically abused the mother and the mother and the boyfriend have a history of engaging in domestic

---

[2] "When reviewing a judgment terminating parental rights, we view the facts in the light most favorable to the judgment." *Interest of D.L.S.*, 606 S.W.3d 217, 220 n.1 (Mo. App. W.D. 2020).

[3] The children's father consented to the termination of his parental rights to D.H. and M.H.

2

violence such that the child would be at risk in the home. After the child's birth, the mother was unable to demonstrate ability to provide proper care for the child in spite of efforts by hospital staff, including ability to feed the child.

The court sustained the allegations in Count 1 of the petition as to Mother by clear and convincing evidence and scheduled a disposition hearing to take place in April of 2019.

On April 17, 2019, the court conducted a disposition hearing, after which the court entered its Findings and Recommendations. The court found that D.H. was at risk of harm due to parental mental health conditions and domestic violence such that removal was necessary. The court made a finding that "[a]t the hearing, the mother exhibited apparent symptoms of a delusional condition. She stated that her mother is not her mother and people are hiding her real mother's body." D.H. was committed to the custody of the Children's Division for appropriate placement with a permanency plan of reunification. The court ordered that the Children's Division was to make reasonable efforts to provide a number of services to Mother, including: supervised visits, the maximum number of parent aide hours, individual therapy, psychiatric treatment, medication compliance, parenting education, and a monthly urinalysis.

M.H. came under the jurisdiction of the circuit court pursuant to a petition filed September 13, 2019 in case number 1916-JU001066. That same day, the circuit court entered an order of temporary protective custody, which placed M.H. in the custody of the Children's Division. The court held a protective custody hearing on September 17, 2019, after which the court determined that M.H. was to remain in the protective custody of the Children's Division because M.H. was at risk of the same harm as D.H. due to Mother's mental health and domestic violence concerns. Mother was to be allowed visitation on the condition that visits were supervised by Children's Division or a parent aide.

3

With respect to the case regarding D.H., a permanency hearing was held on December 17, 2019. Based on the evidence received at the hearing, the court changed the permanency plan from reunification to termination of parental rights and adoption, which the court found to be in the best interest of D.H. With respect to Mother, the court found:

> The mother has not been participating in individual therapy until recently. No substantial evidence was presented showing that the mother has significantly addressed her serious mental health condition, especially given the age of this case. Given the seriousness of her mental health condition it is likely that a child placed in her custody would be at risk of harm. The mother has not been consistently participating in visits with the child. During visits with the child, she has not demonstrated appropriate parenting skills and abilities. She has not been consistently participating in court-ordered drug testing. The mother has not maintained communications with Children's Division until recently.
>
> . . . .
>
> The information received showed that the parents are living together and, in view of their failure to participate in services to address domestic violence, this constitutes a further barrier to reunification.

On February 7, 2020, the court conducted an adjudication hearing on the Juvenile Officer's petition regarding M.H. With respect to Count 1 of the Juvenile Officer's petition, the court amended the allegations to conform to the evidence as follows:

> The child, [M.H.] (DOB 09/12/2019), is without proper care, custody and support necessary for their well-being and is subject to the jurisdiction of this Court pursuant to 211.031.1 RSMo in that the mother neglects the child. Specifically, the mother has a pattern of neglect regarding her other child such that this child is at risk. The child's sibling, [D.H.], is under the jurisdiction of this Court in case number 1816-JU001369, due, in part, to the mother's extreme mental health issue and domestic violence. The mother has been unable to achieve reunification with the child's sibling. Additionally, the mother continues to display erratic and concerning behaviors that are consistent with her untreated mental health issues. Since the child was born, medical professionals at Liberty Hospital have observed the mother to be licking formula from the baby's mouth and licking the forehead of the child. This child is at risk of the same or similar neglect as the sibling has experienced absent the intervention of this Court.

4

The court sustained the allegations as amended by clear and convincing evidence and placed M.H. in the custody of the Children's Division for appropriate licensed placement with a permanency goal of reunification. The court referenced the findings made in December of 2019 in the case regarding D.H. The court further found:

> The mother has been diagnosed with a mental illness, Schizophreniform Disorder. The mother is not consistently taking her psychotropic medications. She continues to display behaviors consistent with mental illness. At a recent visit she stated "I hope their faces don't change from sucking cocks." "if they have to its ok, but I just hope they don't". She continues to fail to demonstrate an ability to properly care for an infant. The mother has not been consistently visiting the child. She continues to maintain a relationship with [the children's father], which poses a risk of harm to the child and to herself.

The court ordered a number of services be provided to Mother, including: visits to be supervised by the Children's Division or a parent aide, individual therapy, the maximum number of parent aide hours, psychiatric treatment, medication compliance, parenting education, a referral for a neuropsychological evaluation, and a referral for mediation.

On February 10, 2020, the Juvenile Officer filed a Petition for Termination of Parental Rights regarding D.H. The Juvenile Officer alleged that three statutory grounds – abuse or neglect under section 211.447.5(2), parental unfitness under Section 211.447.5(5), and failure to rectify under section 211.447.5(3) – warranted termination and that termination was in the best interest of D.H.

A permanency review hearing was held on June 1, 2020 in D.H.'s case, after which D.H. remained in the custody of the Children's Division for appropriate licensed placement. The permanency goal remained termination of parental rights and adoption. The court found that Mother had not made significant efforts to visit D.H. and that mother was not participating in

5

therapy. The court found that there was no evidence that Mother was addressing her mental condition.

A dispositional review hearing in M.H.'s case was also held on June 1, 2020. M.H. remained in the custody of the Children's Division for appropriate placement with a permanency plan of reunification. The court found the Children's Division's efforts at achieving the permanency plan had been reasonable, and services ordered remained essentially the same with the addition of drug testing.

Regarding M.H., a permanency hearing occurred on September 8, 2020, after which M.H. remained in the custody of the Children's Division for appropriate placement. The permanency goal changed to termination of parental rights and adoption. The court found:

> The mother has not made substantial progress towards reunification. The mother suffers from a form of schizophrenia. She has not been compliant in taking medication to address her mental health condition. Her continued untreated mental health condition impairs her ability to parent the child. During visits with the children, the mother continues to require prompting and guidance regarding the care of the children. It remains inappropriate to allow her to have unsupervised visits. The mother's housing situation is unknown. She has reported that she is working with a therapist but the Children's Division cannot verify that. The mother has not provided a release of info for her therapy records. The mother is not participating in drug testing. She has not been consistently visiting her child. Her most recent drug test was in January 2020. The child has been placed in her current home since near the date of her birth. Safe reunification with mother is not likely to be possible in the near future. The child requires permanency.

On October 15, 2020, the Juvenile Officer filed a Petition for Termination of Parental Rights regarding M.H. The Juvenile Officer alleged that three statutory grounds – abuse or neglect under section 211.447.5(2), parental unfitness under Section 211.447.5(5), and failure to rectify under section 211.447.5(3) – warranted termination and that termination was in the best interest of M.H.

6

A permanency hearing was held regarding D.H. on November 24, 2020, after which D.H. remained in the custody of the Children's Division. The permanency goal continued to be termination of parental rights and adoption. The court found:

> The mother is not participating in drug testing. Her last test was in the spring of 2020. The mother has not provided a release for her supposed treatment at Swope Parkway Mental Health Treatment. She has only inconsistently and occasionally visited the child. [D.H.]'s case has been open for over a year. Insufficient progress has been made and the child remains at risk of neglect in the mother's custody.

Visitation and services remained essentially the same.

A permanency review hearing was held regarding M.H. on February 19, 2021, after which M.H. remained in the custody of the Children's Division for appropriate placement. The permanency goal remained the termination of parental rights and adoption. The court found that it had received no evidence that Mother was participating in individual therapy, psychiatric treatment, or psychiatric medication assessment. The court further found that mother had not been participating in drug testing. The court found that D.H. would be at risk of harm in Mother's custody.

On April 8 and April 12 of 2021, the trial was conducted in the instant matter. Testimony was received from Dr. Cynthia Taylor, a licensed psychologist who performed a psychological evaluation on Mother in 2019; Colleen Huff, a parent aide; and Kathryn Brayer, a caseworker assigned to D.H. and M.H. Numerous exhibits were also received into evidence, including: Dr. Taylor's psychological evaluation, numerous parent aide reports, medical records, therapy records, and a termination of parental rights report to be considered by the court in determining the best interests of D.H. and M.H. pursuant to section 211.455.3. The court also took judicial notice of the case files in case numbers 1816-JU001369 and 1916-JU001066.

7

Dr. Taylor diagnosed Mother with Schizophreniform Disorder Without Good Prognostic Features and a Specified Trauma and Stressor Related Disorder. Dr. Taylor testified that the diagnostic criteria[4] for schizophreniform disorder is the same as for a diagnosis of schizophrenia, with the distinction being that schizophrenia requires observing the criteria for six months or longer, while Dr. Taylor met with Mother for a period of less than six months such that a diagnosis of schizophreniform disorder was appropriate. Dr. Taylor testified that she diagnosed Mother's condition as "without good prognostic features" because Mother was displaying characteristics that placed her at risk for ongoing difficulties, and that these difficulties can be ongoing and considerable without medication and other interventions. Dr. Taylor noted that Mother had a previous diagnosis of paranoid schizophrenia. In 2015, Mother had been diagnosed with paranoid schizophrenia after being hospitalized due to homicidal and suicidal ideation. Dr. Taylor testified that, once present, schizophrenia is often a persistent diagnosis.

Dr. Taylor reported that, during interviews, Mother would often pause for extended amounts of time before answering, sometimes as long as three minutes. Dr. Taylor noted that Mother's responses to questions were at times inappropriate. Mother denied having any prior mental health diagnoses or a history of mental health conditions and "did so with an unusual smile on her face." Regarding Mother's parenting capacity, Dr. Taylor reported that Mother's statements in response to the parenting capacity questions "were difficult to track and showed lack of insight, understanding of parent/child roles, and indicated that she may have a distorted understanding of her child's role in her life."

---

[4] Dr. Taylor testified that schizophreniform disorder requires two or more of the following criteria for more than one month and less than six months: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, or diminished emotional expression.

8

Dr. Taylor evaluated Mother's IQ at 60, while acknowledging that untreated mental illness can affect a person's IQ results. Dr. Taylor administered the Minnesota Multiphasic Personality Inventory (MMPI-2), which is used to address adult psychopathology and major symptoms of social and personal maladjustment. Mother reported a number of psychotic symptoms and experienced hallucinations and delusions, including paranoid ideation. Following Dr. Taylor's evaluation in 2019, Dr. Taylor recommended that Mother receive a psychiatric evaluation to determine the appropriateness of psychotropic medication and recommended that Mother participate in individual therapy.

Parent aide Huff testified regarding observations during Mother's visitations. Huff testified that Mother would often need to be prompted to feed the children or provide necessary care and that there were numerous times when Mother did not have the necessary supplies for visits. Huff reported concern regarding the way Mother spoke to her children, including some instances when Mother said bizarre and inappropriate things: "I remember one of them was about the baby's skin color and how that wasn't her baby because of the color of her skin. There were just very – some of the conversations that she had with the babies were very inappropriate."[5] Huff testified that she never recommended that Mother have unsupervised visits because of safety concerns. Huff also reported difficulties with receiving the visitation reports from another parent aide, who reported that Mother refused to sign the required visitation form.

Caseworker Brayer testified that the initial barriers to reunification were Mother's ongoing mental health issues, appropriateness of parenting skills, housing stability, and concerns

---

[5] The parent aide reports that were introduced as exhibits also indicated that parent aides were concerned regarding bizarre statements made by Mother in reference to her children. One report indicated: "[Mother] made some alarming comments such as she looks in [D.H.'s] eyes and she sees some demonic sexual assault." In the notes regarding that visit, the parent aide emphasized the importance that Mother attend all therapy sessions.

regarding domestic violence with the children's father. Brayer testified that Mother had not consistently participated in psychiatric care and had not consistently taken prescribed medication. Mother reported to Brayer that she did not need medication and will not be taking any medication. Brayer testified that Mother had made several bizarre or concerning statements, including declaring in court that Mother was in the witness protection program and that Brayer was violating Mother's rights as a caseworker. Brayer reported concern about these statements because they indicated that Mother was out of touch with reality, which could place her children at risk of harm or neglect. Brayer testified that Mother had seemed to go back and forth between periods of instability and lucidity. Brayer testified that Mother had missed periods of visitation, including for a three-month period. Brayer testified that she had not been able to recommend that Mother have unsupervised visits due to safety concerns; that there were no services that had not already been offered to Mother to help her; and that the barriers to reunification remained the same as when D.H. first came into custody. Brayer testified that the termination of Mother's parental rights was in the best interests of D.H. and M.H.[6]

Mother did not testify at trial.

At the close of evidence, the guardian ad litem ("GAL") for the children recommended termination of Mother's parental rights. The GAL stated that her belief that the Juvenile Officer had presented sufficient evidence to support the statutory grounds alleged in the petition as well as the best interest finding. The GAL stated that the evidence indicated that there were ongoing and consistent concerns with Mother's ability to parent the children; that the children needed

---

[6] At the time of the trial, M.H. and D.H. were placed in the care of a maternal aunt and her husband.

stability and permanency; and that the termination of Mother's parental rights was appropriate so that the court ordered goal of adoption could be pursued.

Following the trial, the trial court entered a judgment, finding by clear, cogent and convincing evidence that three statutory grounds warranted termination and finding that termination was in the best interests of D.H. and M.H. Pursuant to section 211.447.5.(2), the trial court found that D.H. and M.H. had been abused or neglected by Mother. Pursuant to section 211.447.5(3), the trial court found that the children had been under the jurisdiction of the court for more than one year, that the conditions that led to the assumption of jurisdiction still persisted, and that conditions of a potentially harmful nature continued to exist. Pursuant to section 211.447.5(5), the trial court found that Mother was unfit to be a party to the parent and child relationship with D.H. and M.H.

Mother now appeals to this court.

## Standard of Review

On appeal from a judgment terminating parental rights, the trial court's judgment will be affirmed unless there is not substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In re J.A.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014); *In re Q.A.H.*, 426 S.W.3d 7, 12 (Mo. banc 2014). In assessing the sufficiency of the evidence to support the judgment, an appellate court views the evidence and inferences to be draw therefrom in the light most favorable to the judgment and defers to the trial court's credibility determinations and resolutions of conflicting evidence. *In re M.J.M.*, 553 S.W.3d 327, 336 (Mo. App. W.D. 2018) (citing *J.A.R.*, 426 S.W.3d at 626). The appellate court recognizes that the trial court is free to believe

11

any, all, or none of the evidence and that it is not the role of the appellate court to re-evaluate the evidence through its own perspective. *Id.*

To terminate parental rights, the trial court must first find clear, cogent, and convincing evidence of one or more grounds for termination outlined in section 211.447. § 211.447.6;[7] *Q.A.H.*, 426 S.W.3d at 12. After determining that at least one statutory ground has been proven, the trial court must also find, by a preponderance of the evidence, that termination is in the best interest of the child. *J.A.R.*, 426 S.W.3d at 626; *Q.A.H.*, 426 S.W.3d at 12. Appellate review of the best interest finding is for abuse of discretion. *J.A.R.*, 426 S.W.3d at 626. "An abuse of discretion occurs only when the trial court's ruling is clearly against the logic of the circumstances and [is] so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *In re K.S.*, 561 S.W.3d 399, 406 (Mo. App. W.D. 2018) (quoting *In re A.C.G.*, 499 S.W.3d 340, 344 (Mo. App. W.D. 2016)).

## Analysis

Mother raises four points on appeal, challenging each of the statutory grounds that the trial court found warranted termination, as well as the trial court's best interest determination. With respect to the statutory grounds supporting termination under section 211.447.5, sufficient proof of any one of the grounds is sufficient to sustain the trial court's judgment when coupled with a finding that termination is in the best interests of the child. § 211.447.6; *K.S.*, 561 S.W.3d at 406 ("When the trial court finds multiple statutory grounds for termination of parental rights,

---

[7] Section 211.447.6 provides:

> The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer . . . if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of this section.

12

in order to affirm the judgment this Court need only find that one of the statutory bases was proven and that the termination was in the best interests of the child."). Because we find that the trial court did not err in determining that section 211.447.5(3)[8] provided a statutory ground for termination, and because the trial court did not abuse its discretion in finding that termination was in the best interests of D.H. and M.H., the judgment is affirmed.

Before addressing the merits of Mother's appeal, we note that Mother's brief contains deficiencies in violation of Rule 84.04. Rule 84.04(c) provides that a brief's statement of facts "shall be a fair and concise statement of the facts relevant to the questions presented for determination" and that "[a]ll statement of facts shall have specific page references to the relevant portion of the record on appeal[.]" In this matter, Mother's statement of facts was simply a brief procedural history of the case and did not attempt to provide a portrayal of the evidentiary facts of the case, despite Mother making evidentiary challenges in her points on appeal.

Mother's briefing also raises multifarious points on appeal. Mother's first point seeks to challenge the evidence in support of each of the three independent statutory grounds which the trial court found warranted termination.[9] "A point relied on violates Rule 84.04(d) when it

---

[8] Section 211.447.5(3) provides a statutory ground which can support termination under the following circumstances:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

[9] In full, Mother's first point states:

> The trial court erred in terminating [Mother's] parental rights, because it failed to comply with the requirement of section 211.447.10, in that it concluded, without sufficient admissible evidence, that there was a causal relationship between [Mother's] mental illness and harm to [D.H.] and [M.H.],

groups together multiple, independent claims rather than a single claim of error, and a multifarious point is subject to dismissal." *Kirk v. State*, 520 S.W.3d 443, 450 n.3 (Mo. banc 2017). By asserting that the trial court erred with respect to three independent legal determinations, Mother's first point is multifarious and preserves nothing for review. *See id.* Mother's third point on appeal is likewise multifarious in that it seeks to challenge the trial court's findings with respect to two independent statutory grounds supporting termination – failure to rectify and parental unfitness.[10]

Although courts have discretion to review noncompliant points, *ex gratia*, when the arguments are readily understandable, there is a further problem with Mother's briefing on these points in that Mother never makes clear what kind of a challenge she is raising in either her first or third point on appeal. On appeal from a judgment terminating parental rights, the judgment will be affirmed unless there is not substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *See Murphy*, 536 S.W.2d at 32. Although Mother's briefing recognized the four *Murphy v. Carron* grounds, neither her first or third point makes clear what type of legal challenge Mother is raising. Although Mother's first point indicates that she is making an evidentiary challenge, the argument section that follows does not make entirely clear whether she is making a challenge that the trial court's judgment is not supported by substantial evidence or whether the trial court's judgment is against the weight

---

and therefore that conclusion improperly supported the abuse or neglect ground in 211.447.5(2), the failure to rectify ground in 211.447.5(3), and the parental unfitness ground in 211.447.5(5).

[10] In full, Mother's third point states:
The trial court erred in terminating [Mother's] parental rights, because it improperly concluded that she failed to rectify the conditions that led to [D.H.] and [M.H.] being taken under jurisdiction, and that she was unfit, in that both children were taken from her at the hospital upon their births and she was never allowed the opportunity to demonstrate that she could parent them.

14

of the evidence. These are distinct legal challenges that require a distinct analytical framework. *See Ivie v. Smith*, 439 S.W.3d 189, 199-200, 205-06 (Mo. banc 2014); *Koch v. Koch*, 584 S.W.3d 347, 355 (Mo. App. S.D. 2019). Although these two challenges are distinct, each requires an appellant to present an accurate depiction of the evidence favorable to the trial court's judgment, *see id.*, which Mother's briefing does not attempt to do. Further, although the language of Mother's first point relied on indicates that she is making a substantial evidence challenge, the argument section that follows is largely comprised of evidence contrary to the trial court's judgment while ignoring evidence favorable to the trial court's judgment. In a substantial evidence challenge, "[a]ppellate courts accept as true the evidence and inferences . . . favorable to the trial court's decree and disregard all contrary evidence." *Ivie*, 439 S.W.3d at 200 (internal quotations omitted); *see also J.A.R.*, 426 S.W.3d at 631 n.12 (without identifying the evidence in the record favorable to a challenged proposition and explaining why that evidence and its reasonable inferences are such that the trial court could not reasonably reach its determination, arguments that a judgment is not supported by substantial evidence are devoid of analytical or persuasive value). The failure to properly raise and analyze evidentiary challenges has at times led Missouri courts to decline review altogether. *See In re C.Z.N.*, 520 S.W.3d 828, 833-35 (Mo. App. S.D. 2017).

There is yet a further problem with Mother's appeal. Mother has failed to provide a complete record on appeal. "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant." *City of Kansas City v. Cosic*, 540 S.W.3d 461, 464 (Mo. App. W.D. 2018) (quoting Rule 81.16(a)). In this matter, Mother raises points challenging the sufficiency of the evidence in support of the trial court's statutory determinations and best interest determination. However, Mother has failed to include

15

in the record all of the evidence that was before the trial court. Mother electronically filed a number of exhibits with this court, but failed to include a number of exhibits that were admitted at trial. Mother challenges the evidence supporting the trial court's determination that there was a causal connection between her mental condition and harm to the children; however, Mother has failed to include in the record on appeal all of the medical records that were before the trial court. Exhibit 22 apparently included medical records from Rediscover, where Mother apparently received therapy and/or psychiatric services in 2019. Exhibit 30 apparently included records from Rediscover from October of 2019 to the present. These exhibits were admitted at trial without objection, yet are not included in the record on appeal. Exhibit 29 included records from St. Luke's Crittenton, which were apparently medical records that Mother's counsel indicated were "essentially the same" as Exhibit 13, which included Dr. Taylor's report and is contained in the record on appeal. Exhibit 29 was admitted without objection. Although Exhibit 13 has been deposited in the record on appeal, and there were indications of Exhibit 29's similarity to Exhibit 13, this court has no way to verify whether the omitted exhibit was duplicative or contained additional evidence that may have supported the trial court's judgment. Exhibit 26 apparently contained Truman Medical Center Lakewood Hospital records regarding Mother. Mother's counsel made a nonspecific objection that Exhibit 26 contained "some hearsay," but otherwise there were no objections to Exhibit 26. The trial court admitted Exhibit 26 and instructed Mother's counsel that if there was something specific and substantive to which counsel wanted to object to inform the court. Exhibit 32 included Liberty Hospital records relating to Mother. Mother's counsel objected to hearsay on page 42 of that exhibit, and objected that the hearsay on page 42 was not relevant, prejudicial, and in need of further foundation. The trial court admitted exhibit 32 over counsel's objection, but informed counsel that the trial court would carefully

16

review page 42 and would not consider any inappropriate hearsay contained on that page. Exhibit 32 is not contained in our record on appeal. These omissions from the record on appeal represent a significant amount of evidence that was before the trial court and may have supported the trial court's judgment. Mother asks this court to find error with regard to the evidence in support of the trial court's findings regarding Mother's mental condition without providing this court a full picture of the evidence before the trial court. When exhibits necessary to the determination of a point on appeal are omitted from the record, "such evidentiary omissions will be taken as favorable to the trial court's ruling and unfavorable to the appeal." *Cosic*, 540 S.W.3d at 464 (citation omitted).

There are further omissions from the record with respect to Mother's fourth point in which she contends that the trial court abused its discretion in finding by a preponderance of the evidence that termination was in the best interests of the children. Exhibit 1 included a termination of parental rights study. Exhibit 37 was apparently an addendum to that study. These exhibits were admitted for the purpose of determining whether the termination of parental rights was in the best interests of the children; however, these exhibits were not included in the record on appeal. Thus, Mother asks as to find error in the trial court's best interest findings without the evidence that was before the trial court in making that determination.

In this matter, despite the briefing and analytical deficiencies in these points on appeal, we exercise our discretion to review whether the trial court's determination that section 211.447.5(3) – failure to rectify – was supported by substantial evidence to the extent that

17

Mother's briefing and the record on appeal allows. We then proceed to address Mother's fourth point on appeal, which challenges the trial court's best interest determination.[11]

**Failure to Rectify**

Mother contends that there was insufficient evidence presented at trial showing a causal relation between Mother's mental illness and harm to D.H. and M.H. as required by section 211.447.10 such that Mother's mental illness improperly supported the trial court's finding with respect to the statutory ground of failure to rectify under section 211.447.5(3). We disagree.

Section 211.447.5(3) provides a statutory ground for termination when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Missouri courts have recognized that section 211.447.5(3) provides a ground for termination when sufficient proof of three elements is present:

> (1) "[t]he child has been under the jurisdiction of the juvenile court for a period of one year;" (2) "the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist;" and (3) "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home."

*In re J.P.B.*, 509 S.W.3d 84, 90 (Mo. banc 2017). In assessing whether to terminate pursuant to section 211.447.5(3), the trial court is required to consider and issue findings on certain

---

[11] It is unnecessary to address Mother's second point on appeal, as only one statutory ground is necessary to affirm the trial court's judgment when coupled with a valid best interest finding. *In re K.S.*, 561 S.W.3d 399, 406 (Mo. App. W.D. 2018)

enumerated factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

§ 211.447.5(3)(a)-(d).

The circuit court's judgment stated:

Pursuant to Section 211.447.5(3) RSMo., the Court finds by clear, cogent and convincing evidence that the children have been under the jurisdiction of the Family Court for more than one year, that the conditions which led to the assumption of jurisdiction still persist, and that conditions of a potentially harmful nature continue to exist. Specifically, the mother has failed or refused to address her significant mental health [issues], domestic violence with the children's father or the other reasons why the children came into care. There is little likelihood that conditions will be remedied at an early date so that the children can be returned to [Mother]. Continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home.

The trial court also issued findings on the required factors set forth in section 211.447.5(3)(a)-(d). With respect to factor (a), the trial court found that competent evidence showed that Mother failed to make progress in complying with the terms of social service plans entered into with the Children's Division. The trial court found that Mother had been provided numerous services, including individual therapy, psychiatric treatment, medication compliance, and a parent aide to provide parenting education, but that Mother's participation in these services

19

was inconsistent. Mother was not consistent in taking prescribed medication. Mother's contact with the Children's Division was inconsistent. The trial court found that Mother failed to make sufficient progress with the services offered to help her maintain her mental stability.

With respect to factor (b), the trial court found that Mother failed to adjust her circumstances and conduct on a continuing basis in order to provide a proper home for the children. The trial court found that, although the children came under the court's jurisdiction due to Mother's extreme mental health issues and domestic violence history with the children's father, Mother failed to appropriately address her serious mental health issues or take advantage of services provided to assist her with these issues. The trial court also found that Mother's contact with the Children's Division was inconsistent as was her participation in random drug testing. The trial court found that Mother's visits with the children had not progressed to unsupervised visits despite Mother receiving parenting education and services for over two years. The trial court found the testimony of parent aide Huff to be credible and found that it established that Mother often lacked necessary supplies for visits and would often need redirecting and prompting in order to provide basic care during visits. Mother would often speak to the children inappropriately and would sometimes make bizarre comments to and about the children. The trial court found that Mother was affectionate towards the children, but that the children were not bonded to Mother and did not go to Mother for comfort, but instead would go to the parent aide for comfort. The trial court found credible parent aide Huff's testimony that the few hours of supervised visitation were the extent of Mother's parenting capabilities.

With respect to factor (c), Missouri courts have determined that evidence of a mental condition must be analyzed in three prongs in order to make an adequate finding: "(1) documentation—whether the condition is supported by competent evidence; (2) duration—

20

whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control." *In re K.A.W.*, 133 S.W.3d 1, 14 (Mo. banc 2004). In its judgment, the trial court appropriately cited the three prongs and found that each supported its finding that Mother has a mental condition which is permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders Mother unable to knowingly provide the necessary care, custody and control. The trial court found that Mother has a mental condition that she refuses to acknowledge or treat such that the children are at significant risk of harm if placed in her care. The trial court found that the children originally came into care due in part to Mother's untreated mental health which placed the children at risk of harm. Mother was previously hospitalized in 2015 due to homicidal ideations and passive suicidal ideations and diagnosed with paranoid schizophrenia. The trial court found that Mother suffers from aural hallucinations, which, during her pregnancy were threatening her and her unborn child, D.H. The trial court found the testimony of Dr. Taylor to be credible. The trial court noted that Mother has exhibited symptoms of a delusional condition in court proceedings, and that Mother has, on multiple occasions, exhibited erratic behavior including signs of paranoia and made bizarre statements when interacting with Children's Division and her parent aide. The trial court found that around July 2019, Rediscover[12] records documented that Mother presented scattered, paranoid, and disconnected, and that Mother presented paranoid with psychosis. Mother was soon after discharged from

---

[12] Rediscover is apparently a therapy provider. Mother failed to include in the record on appeal Rediscover records which were admitted at trial. In this matter, our assessment of the evidence is obstructed by Mother failing to provide a complete record of the evidence before the trial court, and the omitted exhibits will be taken as unfavorable to Mother's appeal. *See Cosic*, 540 S.W.3d at 464.

therapy at Rediscover due to multiple missed appointments. The trial court found the testimony of caseworker Brayer to be credible. In particular, the trial court found that Brayer testified credibly that Mother does not seem to be connected to reality and poses a safety risk to the children. The trial court found that Mother's mental health diagnoses are well documented by substantial evidence, that her conditions have been consistent since her initial diagnosis in 2015, and that Mother's unwillingness to acknowledge her condition, participate in available therapeutic services, or remain on medication render her mental condition to be permanent, such that there is no reasonable likelihood that Mother's mental condition can be reversed. The trial court further found that Mother's condition is so severe that it would place the children at significant risk of harm and that Mother is unable to safely provide the children with minimally acceptable care.[13]

Section 211.447.10 provides:

The disability or disease of a parent shall not constitute a basis for a determination that a child is a child in need of care, for the removal of custody of a child from the parent, or for the termination of parental rights without a specific showing that there is a causal relation between the disability or disease and harm to the child.

Mother contends that there was insufficient evidence from which the trial court could find a causal relation between Mother's mental condition and harm to the children.

We find that there was sufficient evidence from which the trial court could reasonably find a sufficient causal relation between Mother's untreated mental condition and harm to D.H. and M.H. It is not necessary to wait until children are harmed in order to find a causal relation between a mental disability or disease and harm to the children. *In re M.J.*, 539 S.W.3d 82, 86

---

[13] The trial court found that there were no allegations or evidence indicating that the factor enumerated in section 211.447.5(3)(d) was applicable in this case.

(Mo. App. W.D. 2017) ("We need not subject the Children to a dangerous situation and wait for them to be harmed before steps are taken to protect them."); *cf. In re T.D.*, 645 S.W.3d 669, 677 (Mo. App. E.D. 2022) ("The court, when faced with a potentially harmful situation, is not required to wait for actual harm to be inflicted on the child; it may act to prevent the deterioration of the child's situation."). In this matter, substantial evidence supported the trial court's finding that Mother's mental condition causes her to suffer from delusions and a disconnect from reality such that placing the children in her care would result in a significant risk of harm. In the light most favorable to the judgment, the record indicates that Mother repeatedly made bizarre, paranoid, and delusional statements, from which the trial court could reasonably infer that Mother could form (and at times had formed) delusional beliefs about the children and her surrounding circumstances such that the trial court could reasonably infer that the children would be at risk of harm if placed in her care. These statements ranged from seeing demonic sexual assault in her child's eyes, believing that outside forces controlled the bodies of others, that Mother was constantly being attacked, and a belief that her child was not her child. Additionally, the record contains evidence from which the trial court could reasonably infer that Mother's paranoia and delusions contributed to her acting in a hostile manner towards those around her. Mother exhibited these symptoms throughout the time period while the children were under the jurisdiction of the court. Mother refused to acknowledge her mental condition and failed to make a consistent effort to seek treatment for the condition. In the instances in which Mother did participate in therapy, the record indicates that Mother often did not provide truthful answers in response to questions. Mother made little effort to participate in individual therapy or counseling, attending two sessions over two and a half years. Her psychiatric treatment at Rediscover was apparently discontinued at some point in 2019 due to multiple

23

missed appointments. During her treatment at Rediscover, Mother continued to exhibit the same symptoms as she had exhibited at the time D.H. was removed form her care and during her evaluation with Dr. Taylor. Mother thereafter refused to receive therapy from multiple therapists authorized by the Children's Division. In late 2019, Mother went to Swope Health Services ("Swope") and agreed with Swope professionals to participate in psychiatric treatment and individual therapy as well as working with a case manager in a community support program. At her intake at Swope, Mother was assessed for schizophrenia and the notes of the intake indicated that Mother continued to exhibit the same and similar symptoms as she had exhibited in the evaluation by Dr. Taylor and which at times were reflected in the parent aide reports of Mother's supervised visitations. After her initial individual therapy session, Mother missed all of her remaining individual therapy appointments and was discharged due to non-compliance with therapy in March of 2020. Mother was also discharged from community support services at Swope due to her failure to engage with her case manager despite numerous outreach attempts.

The evidence in the record, when coupled with Mother's refusal to acknowledge or make a genuine effort to seek treatment for her mental condition, supports the trial court's determination that Mother's condition was documented by competent evidence, of a severity so as to render Mother incapable of providing necessary care, and of a nature such that there is no reasonable likelihood that the condition can be reversed. *K.A.W.*, 133 S.W.3d at 14.[14]

---

[14] Although Mother makes a substantial evidence challenge on appeal, and thus the evidence is viewed in the light most favorable to the trial court's judgment with contrary evidence disregarded, *Ivie*, 439 S.W.3d at 200, Mother's briefing attempts to rely on the notes of Mother's participation in six psychiatric treatment sessions through Swope from late 2019 through January of 2021 with Molly Oligbo, a Psychiatric Mental Health Nurse Practitioner. During the initial in-person appointment, Mother continued to report/exhibit the same and similar symptoms that had led to her previous diagnoses. Oligbo began treating Mother for "unspecified psychosis." After the initial appointment, the sessions consisted of five 15-20 minute sessions during which Mother would self-report her symptoms and life circumstances. These records indicated that Oligbo would credit Mother for things as they were reported by Mother. For example, Oligbo's notes credited Mother for having good judgment as evidenced by her compliance with

Moreover, Mother's mental condition was not the only reason that the trial court found that the grounds for termination under section 211.447.5(3) had been proven by clear and convincing evidence. With respect to statutory factors (a) and (b), the trial court found that Mother failed to make progress in complying with the terms of social service plans entered into with the Children's Division, and that Mother failed to adjust her circumstances and conduct on a continuing basis so that she can provide a proper home for the children. Substantial evidence supported the trial court's findings with respect to these factors. The record indicates that Mother was regularly uncooperative with her case worker and would refuse to communicate with her case worker. Mother made little effort at participating in individual therapy. The record indicates that Mother made no attempt to address domestic violence concerns that led, in part, to the court's assumption of jurisdiction over D.H. and M.H. Mother continued to live with the children's father throughout most of the time periods that she was provided services while not engaging in counseling or making attempts to address domestic violence concerns. At the time

therapy and ability to keep appointments even though the Swope records indicate that Mother failed to keep her therapy appointments at Swope and was in fact discharged from both individual therapy and Community Support Services during this time due to her failure to keep appointments and communicate with her case manager. During the Oligbo sessions, Mother would self-report that she had no symptoms and would respond to inquiries with statements contradicted elsewhere in the record. In addition to the statements contradicted by the Swope records, the parent aide reports submitted in late 2020 indicate instances of Mother continuing to make strange and paranoid comments during the time period that Mother was reporting to Oligbo that she had no symptoms, such as that the children's placement provider was intentionally making her children's skin darker. Oligbo's notes indicate that Oligbo stopped prescribing prescription medication to Mother at Mother's request by January of 2021.

The trial court did not find the notes of Oligbo's therapy sessions to be persuasive and did not credit them for the proposition that Mother's symptoms had ceased. Although, again, in a substantial evidence challenge we disregard evidence contrary to the trial court's judgment, we note that a trial court is not required to believe the medical reports or testimony of a parent's chosen professional over other evidence. *See In re Q.A.H.*, 426 S.W.3d 7, 13-14 (Mo. banc 2014) (trial court could reasonably discredit mother's chosen psychiatrist's opinions based primarily on mother's self-reporting and instead could properly consider other evidence of mother's mental condition and parenting abilities).

25

of the trial, it was unclear whether Mother was still living with the children's father, but Mother, having the opportunity to provide clarity on these issues, elected not to testify.[15]

Additionally, there were continued concerns regarding Mother's parenting ability and the safety of the children if returned to her care. Mother was unable to progress to a point where a parent aide or caseworker recommended unsupervised visits. Parent aide Huff and case worker Brayer both testified to concerns about the children's safety if returned to Mother's care, and the trial court found this testimony credible. Huff testified that Mother needed ongoing assistance and supervision to parent the children. Huff's testimony provided examples of her safety concerns in which Mother attempted to feed the children's bottles that were way too hot and an instance where Mother attempted to place one of the children in a bath with the water too hot approximately one month before trial. The trial court found credible Huff's testimony that the few hours of supervised visitation appeared to be the extent of her parenting capabilities. At the time of the trial, Mother had been receiving services for over two years. The trial court could reasonably find that Mother had failed to make sufficient progress with the services offered to her and that, in spite of the services offered, Mother had not adjusted her circumstances and conduct on a continuing basis in order to provide a proper home for the children.

Substantial evidence supported the trial court's determination that the children had been under the jurisdiction of the court for over one year; that the conditions that led to the assumption of jurisdiction still persist; that there is little likelihood that these conditions will be remedied at an early date so that the children can be returned to Mother; and that the continuation of the

---

[15] "It is a well-settled principle that the failure of a party, having knowledge of the facts and circumstances vitally affecting the issues at trial, to testify on his or her own behalf raises a strong presumption that such testimony would have been unfavorable to the party." *J.A.R.*, 426 S.W.3d at 631 n.11 (citing *In re S.M.B., Jr.*, 254 S.W.3d 214, 220-21 (Mo. App. S.D. 2008)).

parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home. *See* § 211.447.5(3); *J.P.B.*, 509 S.W.3d at 90. The trial court did not err in determining that section 211.447.5(3) provided a statutory ground for termination.

## Best Interests Determination

In her fourth point, Mother also contends that the trial court abused its discretion in determining that termination of Mother's parental rights was in the children's best interests. We disagree.

As noted previously, Mother has failed to provide a complete record on appeal for resolution of whether the trial court abused its discretion with respect to its best interest determination. Section 211.455.3 provides that, except in cases filed under section 211.444, the trial court shall order an investigation and social study to be made, and that a written report shall be provided to the court to aid the court in determining whether termination is in the best interests of the child. § 211.455.3. Such report "shall include such matters as the parental background, the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts as are pertinent to the determination. . . ." § 211.445.3. In this matter, such a report was admitted as Exhibit 1 for the purpose of assisting the trial court in assessing whether termination was in the best interests of D.H. and M.H. However, Mother has not included Exhibit 1 in the record on appeal. "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant." *Cosic*, 540 S.W.3d at 464 (quoting Rule 81.16(a)). When such exhibits are not made a part of the record on appeal, "such evidentiary omissions will be taken as favorable to the trial court's ruling and unfavorable to the appeal." *Id.* (citation omitted). This omission will be taken as unfavorable to Mother's appeal.

27

In assessing whether termination was in the best interests of the children the trial court issued findings on each of the statutorily required factors enumerated in 211.447.7.  The trial court found that the children do not have a strong emotional bond with Mother; that Mother's attempts to maintain regular visitation had been inconsistent, noting gaps in her visitations that twice extended to a period of three months.  The trial court found that Mother provided minimal support for the children; that additional services would not be likely to bring about a parental adjustment enabling a return of the children to Mother; and that Mother had demonstrated a lack of commitment to the children by refusing to meaningfully and consistently cooperate with court-ordered programs intended to aid Mother.  Mother makes arguments relating to the evidence underlying the factors and the weight to be given to such evidence and the corresponding factors.  However, after examining the record and the trial court's findings and considering Mother's arguments on appeal, we find that the trial court could reasonably determine that termination was in the best interests of D.H. and M.H.  Accordingly, the trial court did not abuse its discretion in making this determination.

**Conclusion**

The judgment is affirmed.

_____
Thomas N. Chapman, Presiding Judge

All concur.